and Thomas? Erskine is first? Yes. Okay, so Ms. Van Ness, you're going to go first. So, Ms. Van Ness, you're going to go first. You've reserved a minute for rebuttal. And Mr. Calgary, you're going to split the rebuttal. Is that the way this is going? I have here... We each have six minutes. What? I reserved two minutes. Right, that's what I mean. So we're going to have two rebuttals. Okay, so I just want to make sure I've got it. So, all right. So you've got five minutes to start, Ms. Van Ness, and then a minute for rebuttal, and then we're here for Mr. Calgary for four minutes, and then two minutes for rebuttal. Then we'll hear from the government, and then we'll hear the rebuttal. The floor is yours. Okay, good morning. I think that it's safe to say that this is probably the most complicated case factually that I've ever handled in all my years of arguing appeals, and I'm not going to be able to go over much of the factual content that supports my position. But I'll do my best if there are questions or in my argument to refer the judges to sections of my briefs which do provide the support. I also would like to reiterate what I spent the first four pages of my reply brief talking about, which is that the government has made many misstatements of facts in its brief or overstated facts or failed to acknowledge facts that undermine the facts that I'm relying on. And that would be fine if I had raised a sufficiency point, but I did not raise a sufficiency point. I'm arguing that the evidence against Mr. Erskine particularly was not overwhelming such that the trial errors that I discuss mattered. The first trial error is the lies that the chief cooperating witness, Luster, made when he was on the stand. To say that he was the chief witness is really an understatement. He was basically the government's whole case. And he claimed, among many other things, that my client sold him $18,000 worth of cocaine inside my client's apartment, which was a sufficient quantity to high fine him the jury made him a drug quantity on the verdict sheet. There is ample reason to doubt that that happened. In order to basically get a new trial with respect to perjured testimony, you have to show that the witness testified falsely and that the falsehoods were not known to the defendant at the time of the trial. So presumably your client knew that some of these things were false at the time they were abutted, right? Well, I have discussed that in my brief. So, I mean, I think that's we've got to get to really what are the specific portions of testimony that were clearly false and not known to your client. I'm not saying that any of them were not known to my client. I do explain in the brief why it was virtually impossible for the defendant to have been found guilty.  I wasn't persuaded by that. The things that you say he lied about are the easiest things to disprove whether or not what building he lived in, whether the building in the photo was his building or not, who was his superintendent, and whether or not the basements of the buildings were connected. Those are the three lies you point to. And in my view, those are really easy through multiple witnesses, an option of multiple witnesses to disprove. Those are readily disprovable things. But I think the question is, how do you get to the three buildings in question to prove there was no way to go through the three buildings with this alleged master key? That's hard. That's hard to do that. In the middle of trial? How about subpoenaing somebody to say who the superintendent of the building was? You can do that. That's pretty easy to establish who the superintendent of a building was. But in the case of Mr. King, there was no opportunity really to do that or to know for certain that he would testify or not take the fifth. I don't understand. If you know who the superintendent of the building is, you can get a photo of who the superintendent is and just show that photo to the jury and say, that's not the guy in the photo. You don't need to call the guy in the photo and find him, right? You said everybody knew who the super was. Your Honor, I can only say that the defense was very limited to try to correct these errors on the fly. And they weren't prepared for them. For a new trial over these lies when, you know, it seems to me if these lies were that important to his discrediting him and to the case in general, that those things could have been found rather than coming to us. And we wanted a new trial over these things. Well, then it will have to be pushed into a 2255 for ineffective assistance, because I don't think it was that easy. But it certainly could be how you've met the first threshold as to how these are willful falsehoods. I mean, with respect to the super, for example, the testimony from Lester was that your client told him, this is the super. So, I mean, how is that going to be demonstrated to be false? The picture was a government exhibit. It was shown to Lester twice, and each time he picked out this man who was not Derrick King, the super, as the man who my client had identified as the super. But the testimony was that this is what your client told him, right? So that's the lie, that your client told him this is the super. I mean, he may not be the super. But the testimony is that your client told him it was the super. The lie is this is the man that my client said was the super. And it could not have been. Why not? Because that man that he identified lived in Virginia and was a member of the Navy. That doesn't mean that the defendant didn't lie to the witness as to who the person was in the photograph. That's the point, isn't it? I believe that's what my colleague was asking. The actual identity of the individual in the photograph goes to some degree, whether it was or was not a lie. But what the defendant said to Mr. Lester, he could have shown a picture of him making up a complete fabricated story. I believe that the testimony was, and once again, 84 pages of briefs, I'm hard-pressed to find it. The testimony was that Mr. Erskine introduced Mr. Lester to the super. And then at trial, Lester picked a man out of a photograph as that person. Okay. It wasn't just all resting on a photo. Anyway, I don't want to get too bogged down here. I do believe that these were very important lies and that the government had to know about them. The witness was led to make these identifications and to talk about how he was shown the basement of the apartment, the apartment building by my client and shown the masquerade key and how you could go from one building to another. It was not just the simple facts that we're talking about here as a summary. It was detailed facts that showed, that tended to show that Lester knew what he was talking about. And the fact that the sale was in my client's apartment, he said that the, Lester said that the apartment was on the second or third floor. He'd been there plenty of times. It was actually on the sixth floor. It was an apartment he shared with his girlfriend and children. So this was not, I mean, the lies were important to show that Lester knew what he was talking about when he talked about all of his knowledge of my client. The other errors, I think I will rest on my brief, except I also want to say that Lester was also the only witness to, to mention my client's involvement in two of three alleged acts of violence that my client was involved in. Out of all of the shootings and all of the murders and all of the slashings and stabbings, there were only three acts of violence that my client was connected to, and two of them rested solely on the uncorroborated testimony of Lester. And they were impeached. And the third one, that was that Woods, who did the face slashing, was promoted by my client and Wise, the head of Woods' cave. There was no corroboration for that, but Lester also said that he promoted somebody else without any input from Mr. Erskine. So there was no evidence that Mr. Erskine was required to approve promotions. There was also evidence from Lester that my client asked for two shooters from each cave. That would be a total of 16 shooters to be assembled to go to Soundview in the Bronx and shoot up a rival gang, Sex Money and Murder. Not only was Lester's testimony about that suspect in terms of timing, because the vendetta against that particular gang was announced by Reed, the undisputed leader of the gang, months later, but also there was no evidence that anybody ever went to Soundview, 16 people or even one person, to shoot at members of this gang. So the third act was, and this is relevant to the sentencing point as well, this had nothing to do with Lester, but the third attempted act of violence was that my client ordered Stephen Hugh to retaliate against being robbed by shooting at rival gang members in New Rochelle. And that was, that theory of the government at my client's trial was that my client alone was responsible for pressing Hugh to do this. Whereas in the prosecution against Walker, the government's position was that it was Walker alone who pressured Hugh to do this. And the jury was never told the difference, and there was no evidence whatsoever to support the summation arguments that appellant, that my client, Mr. Erson, spoke to Hugh in advance of the shooting. The government produced his phone records, which covered the time before, during, and after the shooting, and there were no calls between Mr. Erskine and Hugh. And there was also no evidence whatsoever that Mr. Erskine talked to Walker and pressured Walker to press Hugh. There was just, this was completely unsupported theory that Mr. Erskine was responsible for this retaliatory shooting. In fact, there was one phone call where my client said, talking about the bail, posting a bail, that... I don't think the government, when you read the government's summation, they didn't say he was, quote-unquote, responsible or that he ordered it. They said that he was upset that Hugh wasn't living up to the rules. The rules. The principles. Living up to the Stone Gorilla principles. That was a conversation... That's what the government said in the summation. They didn't say your client ordered it. No such words were ever used, I could find, but maybe I'm missing it. The appendix of 74 and 75 is when they discuss in the summation. It says that Judge Sutherland said he wasn't living up to the principles of the gang. He was telling the gang disciplinarian afterward that he had done it. That he had handled it. So that's not quite what you said. But that's okay. I don't want to waste your time looking for it now. You can address it in the rebuttal. Yeah, Judge, I mean, I think we're well over the time, Ms. Van Ness. So you've got one minute that you've reserved for rebuttal. I definitely need to discuss during the rebuttal the sentencing point. The what point? The sentencing point. Well, why don't we do that now very briefly, the sentencing point. Okay. There are myriad errors that I've cited in my brief that occurred at sentencing. One of them was the district court's view that the career offender guideline table was mandatory, that he had no ability to deviate from it, which is simply not true. And so he stuck with the career guideline table of level 37 and criminal history category 6, even though there's a guideline that permits him to go downward one criminal history category if he believes that the criminal history overstates the seriousness of the prior conduct. And so he said that was mandatory. And so he didn't really need to resolve any of the other disputes, though he said that they wouldn't matter because, you know, he believed the sentence was fine. But the maintaining drug premises I've already discussed. I think there was no evidence to support that finding, which depended on luster. There was no drugs found in my client's apartment or in the basement or in his car or anywhere. So you're saying that the district court could not have relied on luster to conclude by a preponderance of your client? Well, the district court did not have, he was not privy to the evidence we have in the brief about how luster lied. So that would be one reason to remand. So there's an argument that is contingent on our accepting your argument for a new trial about luster's perjurious testimony. Is that what you're saying? Well, in any event, you could find that these lies about buying the half a brick of cocaine in my client's apartment was false and that the judge, the district court judge, should be aware of that before he made a finding about maintaining drug premises in his apartment. The judge also rejected the argument that Hugh was ordered by my client to have to do a retaliatory shooting. They had switched their tune by the time of sentencing and said that he'd induced you to do this rather than order. But again, there was absolutely no evidence that appellant spoke, that Erskine spoke to either Hugh or Walker about urging this retaliatory shooting. The judge agreed that four levels should be deducted because of the Equal Act, the crack-to-powder-cocaine ratio, but then didn't apply it because he believed the career offender guideline was mandatory. He did give Reed that four-level discount. So you're suggesting the judge didn't realize he was allowed to downwardly bury or sentence below the guideline? I mean, that's a different argument. That's an argument that the judge did not understand that the guidelines are not  Is that your contention, that the district court believed the guidelines to be mandatory and that there was no freedom to impose a sentence below the guideline? I didn't take that to be your argument, but that seems to be what you're saying now. I wish I could find things easier. I mean, the actual... On page 164 of the sentence, as we went through the guidelines, my sentence, whether any of these or all of these are overruled or set aside or not, would be the same. So he clearly understood that, regardless of how these guideline issues turned out, that under the 3553 of factors, this was the sentence he was going to give anyway, right? The court, this is on page 21 of my reply brief, and I think it's in the opening brief as well. At sentencing, on page A148 and 168, the court said, the mandatory minimum is 37. Mr. Erskine is, this is a quote, Mr. Erskine is a career lawyer. He's a career offender, and that requires an offense level of 37 and a criminal history of six. Under the guidelines, right. He's applying the guidelines, and that is the application of the guidelines. If you're a career offender, it affects your offense level and it affects your criminal history category. That's the operation of the guidelines. But he said it was mandatory and required. It did not take – he did not agree that there was any possibility under the 3553. Your argument is that because he used the word mandatory, it means he did not understand that the guidelines are advisory? Yes, and that he was required to impose the guideline of 37 and six, which is a direct quote. Under the guidelines, I mean, he has to do guidelines calculation. That's required procedurally. He can't just say, well, it's pretty high and I'm going to give my sentence. He has to say what is the offense level, what is the criminal history category. By operation of the career offender guideline, the offense level jumps to 37 and the That's required by the career offender guideline. Would you agree? That is not required. That is what the career offender table says, but it is not required. It's what the guideline says. So that's the application of the guidelines. Now, a judge can then, as judges routinely do, say, I'm not following that guideline. I'm not going to do it because I think that this case requires a different sentence, a lower sentence. But you're suggesting that Judge Halpern didn't understand that the guidelines are no longer mandatory since 2005. Yes. This is the one part of my sentencing argument that I've asked the court to consider for plain error because nobody called the special guideline to the court's attention that allowed him to downwardly depart one level in criminal history category. It's a separate guideline. And there was no ñ nobody flagged that for him. But he had that authority even under the guidelines to go down. And he also had authority under the 3553 factors. And he also had authority to consider the seriousness of my client's prior history under 3553. And he also had the authority to ñ And it's your view he didn't understand those things? Yes. I'm saying he didn't understand those things because he point blank said ñ He used the word mandatory. Mandatory and required. Okay. All right. We're way over. I mean, that's okay. Look, I mean, this is a serious case involving serious sentences. And so if we go a little bit over for folks who are looking at ñ one was 420 months and the other is 240-something. So I think that's okay. But in the interest of time, we'll get to Mr. Tapper. Do you want the prosecution to do it first? No, I'll have the prosecution respond to both of you, and then you can get up and do your rebuttals seriatim. So, Mr. Tapper, you reserve two minutes for rebuttals. Yes, Your Honor. So that gives you four out of the gate. Thank you, Your Honor. May it please the Court. On April 27, 2022, Deshaun Thomas came to court thinking there was just going to be another ordinary court date. He was fighting his case. He had not discussed pleas with his attorney. And all of a sudden, outside in the court pens, his lawyer came to him and said, we have this plea offer. You've got to take it. If you don't take it, you're going to rot in jail. We can get you five years if you take this offer. And Mr. Thomas had no knowledge of this plea offer beforehand. This was literally minutes before he was supposed to appear in front of the judge. This argument is happening for the first time on appeal, right? No, it was raised in the motion to vacate his plea. But with respect to the time that he was looking at? The ability that he might – I mean, one of the arguments you're making in your brief is that the lawyer misled him into thinking that he's got a shot at getting five years. Well, he did. He had – I mean, according to the plea offer, he did have a shot to get five years. There was a mandatory minimum of five years. A realistic chance of getting five years. I don't think there's any realistic chance that he was going to get five years. But that's how his attorney sold it to him on that date, that if you take this offer, instead of getting 20, 25, 30 years, we can get you as low as five years. Mr. Thomas was not given any time to think about this, no time to truly understand it, no explanation of what his guidelines were. And as it turns out, the guidelines were obviously the driving force in his sentence. No application. I don't understand why you said that he wasn't given any time to consider this when he expressed some concern to the judge. The judge unequivocally said, well, we'll stop. This is important. We'll stop. We'll do this another time. And then they had another break, right? Yes. I think another 15-minute break. And your client said he wanted to go forward. Is the court suggesting – sorry. No, I think that's important. It is important, but is the court suggesting that a 15-minute break in the middle of a courtroom is enough time to go over a plea offer that he's just gotten for the first time? In my history, I go over – I get a plea offer. Did someone tell the court that he just got it for the first time? You're suggesting that the court knew that and you're somehow – I'm not suggesting the court knew that. Well, the court didn't know that. Yeah, that's correct. So the question put to you is when the judge sees a hesitancy with regard to someone and they take a break, isn't that the appropriate thing to do? Definitely the appropriate thing to do. And the motion to – But there's an unvacated record here, right? I mean, there's an assertion of – there's an assertion of that the attorney overpowered the defendant's will and therefore for it. It was an unwilling plea, correct? That's correct, Your Honor. Isn't that more – better to be raised with regard to questioning the attorney's competency in a collateral proceeding? Well, Your Honor, the point is that at the motion to vacate the plea, these facts were brought up. All we can look at is with regard to what is in the record for us to evaluate the court's reaction to the motion to vacate, correct? I'm sorry. I didn't – For us to review the motion's appeal from the denial of the motion to vacate, we have only the record in front of us to determine, not the characterization of what happened between the attorney and himself. It's not set forth in the record, correct? Well, it's in the record that by affidavit of Mr. Thomas and not disputed by his prior counsel that this was the first day. His prior counsel made certain statements when this motion to vacate came up that disputed certain facts, but then he did not dispute that this was the first day that he gave Mr. Thomas any notice of this plea, and therefore you can extrapolate that it was. All right. And typically in cases as complicated as this, you go to a client, you say what the offer is. Did the court give the defendant an opportunity to take a break and come back another day? No, he did not. Well, but the court did ask after the recess, have you had enough time and an opportunity to discuss the plea with your lawyer? And he said yes. He said he was satisfied with his lawyer. He said that he had discussed every aspect of the agreement and read the agreement, right? He did say that in court, yes. But the point is, Your Honor, that even if that is true, that even – Was there any reason to think it's – No, I'm not – I'm just saying even if that is the fact, the point is, is that he only had that 15 minutes and the prior few minutes before court to go over a plea that was determining the next 20 years of his life in incarceration and possibly even more. And to give up is obviously his right to go to trial. The – I mean, he said very clearly, yes, I'm just at a standstill. It's like a part of me wants to, but part of me is saying, no, I wish I had more time, but we are here now. And what he's being told by his lawyer at that point is, you don't have any time. If we don't take it today, we are not going to get it. But he was told by the judge, we can stop. We can stop because I'm not going to enter a guilty plea here that is not knowing involuntary, right? That's correct. So he's being told by the judge that we can stop. Yes. So – and he rejects that. I am not faulting the court, Judge Halpern, at all in this matter. What I'm faulting is once he – on that day of April 22nd. What I'm faulting is the decision he made when the most evading was made. I know, but whatever the lawyer told him, I'm suggesting it was dispelled by what the judge told him, which is that we don't have to go forward today. So I don't know – Yes, but the point is, is that if they didn't – what he's being told by his lawyer, if they didn't go forward today, he's not getting this plea offer again. He was told the plea expired that day? Yes. And that's the problem, Your Honor, is if he goes forward, he pleads guilty according to a plea offer he really, truly doesn't understand or had time to contemplate. And if he doesn't go forward, chances are he won't get this plea again and not have the chance to get a minimum of five years. So, therefore, he's put in the position of waiving his trial rights and his ability He had a motion to dismiss – a motion to suppress pending, waiving his trial rights, in a total of maybe 15 or 20 minutes of discussion with his lawyer, where all his lawyer is saying to him, if you don't take this, you're rotting in jail, take this, and possibly can get you five years in jail, when he knew that there was no way that the Sean Thomas was getting five years in jail. Do you agree with your client's declaration? You said that his lawyer told him the offer expires today? Where is that in your client's declaration? It's not in my client's declaration. So, just to go back to Judge Leslie's point, you're asking us – to me, that's an important fact. If, in fact, your client was told – if he was presented with a plea, this expires today, that's an important fact. And you suggested that to me, but it's not in the declaration. No, it's not in the declaration, Your Honor. I'm just saying, in typical Southern District practice, if you reject an offer, that offer tends – in this situation, that offer tends to disappear. Since I'm way over, I'll save my time for it.  Thank you. We'll now hear from Mr. Logarajah. I think I'm saying that right, no? Logarajah. Logarajah's correct. Logarajah. I said it correctly first. May it please the Court. Shiva Logarajah. I'm an assistant United States attorney in the Southern District of New York. I represented the government at the trial below, and I also represent the government on this appeal. Let me start with some of the arguments that were raised by my esteemed colleagues on the other side, and I'll start with the first arguments raised by Mr. Erskine's counsel. I want to go right to the false testimony claims, or the perjury claims on behalf of Mr. – or the alleged perjury that Mr. Luster gave at trial. I think, Judge Sullivan, your point was absolutely correct. There is no showing here of perjury. Perjury is false testimony with the willful intent to provide that false testimony. In each of the categories identified by counsel, we don't even get to the place where it is – where the testimony is actually false. So let me first start with the identification of the super. As Your Honors pointed out, what Mr. Luster said was that the super was identified to him by Mr. Erskine. And in the briefing below, in the Rule 33 motion, in the briefs that counsel submitted, nowhere in the briefs did it dispute the fact that actually Mr. Erskine did not introduce that individual as the person who was the super for the building. I heard counsel today say that for the first time. But in any case, that would have been a fact, as Your Honors pointed out, that was known to Mr. Erskine. He could have – counsel could have cross-examined Mr. Luster on that point. And Mr. Luster was not cross-examined on that point. With respect to the misidentification of Mr. Luster's building, Your Honors, the building – the photograph in question was a photograph that zoomed in on four different individuals. The building in the background was not clear. And so it's, again, not clear how that rises to the level of false testimony, again, with the willful intent to provide false testimony. And in any case, the bases for these alleged false statements were available to the defendant. I was most curious about the basements being connected. They made the argument in the briefs that the government knew that the basements weren't connected because they had done search warrants of the two relevant basements and that he was saying – he wasn't saying he was told that the basements connected. I think his testimony was that he showed me – he showed me how the basements were connected. So didn't the government know that was false? No, Your Honor. So there were two separate search warrants executed on the basements here, one at 21 East 21st Street and one at 31 East 21st Street. I believe from the search warrant photographs that the government had in its possession, it does appear that there are some hallways that veer out, but the agents did not traverse the hallways. So that was not a fact that was known to the government by virtue of the fact that search warrants were executed. Okay. So it hasn't been proven one way or the other. That's correct, Your Honor. With respect to the sentencing arguments made by counsel, I want to first address the point about how the government characterized Mr. Erskine's role in the New Rochelle shooting committed by Stephen Hughes. And I think, again, Your Honors are correct. In summation, the government essentially argued that Mr. Erskine put into motion a sequence of events which led to Mr. Hughes' committing of that shooting. And, again, the government put in evidence that Mr. Erskine demanded to talk to Mr. Hughes after being robbed by a rival gang. He complained about Mr. Hughes' unwillingness to retaliate on behalf of the gang. And afterwards, when Mr. Hughes was arrested by state authorities, he again demanded that Mr. Hughes get his weight up in jail and be violent. And that was more than appropriate for the government to argue in summation that as a leader of the gang, Mr. Hughes would have felt pressured by Mr. Erskine and others to commit that retaliatory act of violence. Now, I want to turn now to the arguments raised by Mr. Thomas' counsel. I just wanted to ask you, it wasn't raised today, but on the issue of the admission of some of the photographs and videos and testimony regarding some of the Poughkeepsie murder and the Florida shootings and the Manhattan slashing, what's the government's view on when those things are being offered, not because the defendant participated in those, but as evidence of the enterprise, the racketeering activities of the enterprise, whether a district court should be, under 403, allowing the government to put in things like graphic photos of the injuries or have testimony from one of the victims that their kids were there in the vicinity. Under 403, given that it's not something that the defendant is charged with, and I didn't go through the whole trial, I assume they weren't disputing that the enterprise existed and that the gang was involved in violence, allowing the government to have that much detail about, in graphic form, about the injuries or the killings. Sure, Your Honor. So just with respect to what the defendants were contesting at trial, until the counsel stood up for both the defendants, the government did not know what the theory was going to be. In fact, the defendants had not stipulated to anything prior to trial, which led to 30-plus witnesses being called. And so I think it was totally appropriate. And I would point you to the Matera case, which we cited in our briefs, where, again, criminal acts of non-defendants, which prove the existence of the enterprise are entirely admissible. I understand that. That's routine, but the question is how much detail and in what form when it's only proven for that particular element. The government is right and routinely offers other acts of violence, but it's a little unusual to be submitting photos and crime scene photos and testimony regarding those types of categories of proof. Well, Your Honor, in this trial, this was a trial where the government's theory was that these two defendants were the top upper echelon leaders of this violent nationwide gang. And I think it's completely fair under Old Chief and what this court has said that the government is allowed to prove the human significance of a fact. And the government here is entitled to put on evidence of the violent nature of this enterprise led by these two individuals. And I think, again, just going back to your four-three question, Your Honor, I think the question that this court always looks to is whether or not the evidence is more sensational than the alleged crimes. And here this is an enterprise that is charged with, as part of the predicate acts, charged with committing acts of murder, attempted murder, slashings. And so evidence of those acts, again, I think are totally fair. And the government, particularly in a trial where there are leaders of a violent gang, should be allowed to put that type of evidence in. Was there a request for a limiting instruction? No, Your Honor. There were no requests for limiting instructions. Now, with respect to Mr. Thomas' argument, I think Your Honors, again, hit the appropriate point here, which is Judge Halpern gave this defendant ample opportunity to not proceed. He specifically told Mr. Thomas, on the record, that he did not want to take a plea that was not knowing and voluntary. And after that, the defendant, under oath, said that the plea was going forward voluntarily and of his own free will. And so in response to that, all there is are bald-faced assertions which contradict the statements that the defendant made under oath. And Judge Halpern was well within his right to dismiss the motion to – or to reject the motion to vacate. And I guess unless the Court has any further questions. Well, I guess the question for Mr. – that Mr. Talager has is, like, if the lawyer is, you know, inserting himself and imposing his kind of pressure on his client, that's – that would be a relevant fact. And – but there's not an affidavit or something in the record indicating that at the time that the motion for a new trial – for withdrawing the guilty plea is being made, right? That's correct, Your Honor. And I would point you to Mr. Thomas' affidavit, which essentially said that the lawyer – I think initially it was that the lawyer had told him that he was going to get buried at trial or something to that effect. I think even crediting those assertions under this Court's cases, particularly the June call case, a blunt assessment by a lawyer of the defendant's trial chances does not rise to the level of coercion. So even taking that statement as true, I don't think what Mr. Thomas is alleging would be coercion under this Court's cases. Well, I guess the record is not developed as to whether or not this is a deal that was going to expire in 10 minutes. Yeah. Well, that's correct, Your Honor. And if that's the new claim that is now being advanced, that can be brought in at 2255 with a developed record. But the record that is here is that the lawyer told him that his trial chances were not that high. And, again, that does not rise to the level of coercion. Thank you, Your Honors. And the government would just ask that the Court affirm the judgments below for all the reasons set forth in the government's brief. Okay. Thank you, Mr. Loveraggio. We'll hear now from Ms. Van Ness for a minute of rebuttal. On pages 14 and 15 of my brief, the top of page 15 particularly, I cite several pages of the record for the proposition that Luster not only identified, misidentified a man as the super of the building, but also said that he'd been introduced, that Mr. Erskine had introduced the super to Luster. So those sites are on the top of page 15. But how is that proven false? I guess it's not clear to me why that is a demonstrably false and therefore perjurious statement. Luster said he was introduced to a man who Erskine claimed was the super. Right. Whether or not that is true. So where's the evidence in the record that suggests that indicates that to be perjurious? Whether or not he was the super is sort of beside the point. The point is that Erskine introduced Luster to a man, said he's the super, and Luster pointed to a person in photograph twice and said, that's the man who was supposedly the super. And he was not. So that was false. So he was not the super, and so therefore Erskine could not have said that this is the super. There might be a lot of reasons why Erskine would say things that might not be true to Luster. But it's not clear to me that any of that has been developed to show this is clearly perjurious. I don't know how else to explain it, Your Honor. He was introduced to a man. Okay. Let's not waste time doing it then. Move on. All right. I want to just make a brief point about the underground labyrinth. I made statements relying on this Court's ability to take judicial notice of Google Street Views, and there are three buildings, 21, 25, and 31. And the super, Derrick King, was a super of 21 and 31, not of the middle building. And it defies belief. But why? I don't understand. Why is it impossible that the super of the two outside buildings would have a key that would allow you access to the middle building? Because the super had no contact and no authority with respect to the middle building. But I don't know how. I mean, we're all speculating here as to how the doors that might connect the basements of these three buildings work. And whether there's a key that the super at either of the end buildings would have that would allow him access to the middle building. We just don't know, do we? Do you know? It defies common sense that you would have access to an unrelated building. If you were the tenant of such a building of 25, East 21st Street, would you be happy to know that people from the two adjoining buildings had free access to your basement? I would know what arrangements the landlords or the supers of the buildings that are connected have. All right. But there might have been other ways that Erskine got access to the key to the middle building. But there's nothing in the record about any of that, right? There's lots of statements by Luster about being given the grand tour with Mr. Erskine using the master key that the super provided to him to go from one building to the other. But there's nothing in the record to indicate that these buildings don't have basements that connect or that one doesn't have a basement at all or a basement. I mean, there's nothing like that, right? Your Honor, I'd like to move on. I would like to say with respect to the perjured statements, which I believe is clear from the record, that if any of the statements that Luster made to the jury about his awareness of Erskine's building, apartment, drug dealing on the block, going through the basement, and so forth and so on, were untrue, then the prosecutor would have had to have known that. He knew Derrick King was a person of interest in the investigation. There were surveillance videos of Derrick King. They had Derrick King's driver's license, which was a photo ID, which clearly showed that he was not the person identified in the photo. And just because the defense might have fallen down or could have possibly corrected this, which I still think is a doubtful proposition, the government should not get a free pass on presenting false testimony. There are cases like Napu from the Supreme Court and Salome from this Court, which prohibit the prosecutor from knowingly making false or misleading statements or allowing such false or misleading statements to stand. On the sentencing point, I want to also call the Court's attention to the district courts imposing the same sentence on Mr. Reed as he did on Mr. Erskine. Mr. Reed was the founding member of Gorilla Stone from 2004. My client's involvement went back no earlier than 2018. Erskine visited Reed three times in prison, whereas Luster and Thomas visited him 40 to 60 times. His authority was very limited if you look at the pages of the brief that I've made this point, the opening brief pages 3 to 5 and 38 to 40. He was far less involved in the organization than Reed was. And none of that was taken into account by the district court. He gave Mr. Erskine, for two years of involvement, a 35-year sentence, which I've also raised a substantively unreasonable argument in my brief, and I would ask you to consider that as well. Thank you, Ms. Van Ness. I will now leave it to Mr. Taggart for two minutes to rebut. Thank you, Your Honor. I just wanted to bring up the fact that a calm conversation between a lawyer and client about the ability to win or lose a trial is perfectly acceptable on a defense lawyer. But to yell and scream and force his opinion on his client is not. And that's what happened here. Well, I guess the question is not necessarily whether that's what happened here, but whether or not that's what was presented to Judge Halpern at the time of the request to withdraw the guilty plea. And so why do we stay there? What's the state of the record at that point? I would say the state of the record. A lot of this is not there, right? Well, the only thing that's not there is your co-judge's point of view, that there's no statement that this offer would expire today. Everything else, as far as the pervasiveness of his prior counsel's argument to him, is stated in his affidavit to vacate his plea. What did you say, the pervasiveness of his argument? I mean, the force and the yelling and the forceful attitude and his inability to get any time to truly understand the situation. And I'd just like to move on just very briefly. But your client did tell Judge Halpern he understood. That day he did. He read everything. He had an ample time to review it. So did Judge Halpern should have known that he was being lied to at the time? I think Judge Halpern should have saw the hesitation in my client that day. And once he witnessed that, he heard him say his hesitation. And that's not the only point in the plea allocution that he hesitated. There were other points during the allocution that he hesitated. And I think once he knew that and then later on got the motion to vacate, he should have combined the two and granted the motion. And just very briefly, I'd like to state that as far as the sentencing is concerned here, and I won't go through it in detail because I see my time has expired, but Judge Halpern on the record stated what a horrible childhood and early adulthood my client had, worse than anything he had ever seen, saw the reports from the social workers, and still gave him a guideline sentence. When the guidelines take into consideration every negative factor as opposed to sentencing and never take in anything as to any mitigation factors, and he still gave him a guideline sentence, and I think that was improper. All right. Thank you all. We will reserve decision.